The third appeal this morning is Bolton v. Sheriff of Coweta County, GA. Mr. Howard. Good morning. Good morning. May it please the Court, my name is James Howard and I represent the Plaintiff Appellant Nicholas Bolton in this 1983 and tort claim against the Coweta County Sheriff's Office and three of its deputies. Let me start by saying that this case and this appeal has enormous implications for our society. It shows us the underlying reasons for tragic events that we have seen before. It presents a scenario that will continue to repeat itself unless our courts compel law enforcement officers to abide by their own training and their own departmental policies that are explicitly designed to protect citizens. I submit to you that law enforcement officers will act as they are trained to act unless they understand that law enforcement training is optional. I submit to you that law enforcement officers will abide by their agency and departmental  They will do it. I'm curious about the policies because I watched the video and what I remember is towards the end, right before he shot in the face, three cop cars surrounding him. What were the officers, given your introductory remarks, what are you saying they were trained to do right then? Right then? I will speak about right then, but before I do, I will mention that that scenario would never have arisen if they had abided by the departmental policies and established practices of law enforcement that put them in that situation. By the time they got to that situation, because they engaged in an illegal chase or an unauthorized chase according to departmental policy, they conducted an unauthorized pit maneuver, according to departmental policy, and then after having stopped him, having stopped Mr. Bolton, and once he was immobilized, instead of giving him some kind of a warning that was feasible under the circumstances, he was immediately shot in the hip. At that point... Let's back up. Yes. So this is a Fourth Amendment claim. Yes, it is. So it's not a claim that's governed by departmental policy? Yes and no, Your Honor. No, no, no. It's governed by the Constitution. Your claim, you know, when people want to make bad events into constitutional cases, it may be that the bad event could have turned out differently if somebody had followed their training, but not following your training is not the same thing as violating the United States Constitution. It isn't that clear, if I may, Your Honor, and I will submit to you... The Supreme Court of the United States has said it's not. Your claim, as I understand it, is an excessive force claim under the Fourth Amendment, isn't it? Essentially, yes. Yes. So here's what I understand. Deputy Collins told Mr. Bolton that he was suspected of loitering and wanted him to produce identification and step out of the truck, isn't that right? Yes. And Mr. Bolton instead went, you know, from the front to the back of the truck, but did not produce his identification, isn't that right? He did not. Yes, he did. He did produce his identification. He didn't give it to the officer, did he? Well, I think you need to look at the scenario as it arose. I mean, I've watched this video. I didn't see where he gave it to the officer. He did not give it to the officer because the officer did not take it. You're skipping over, I think, some critical facts, but before we get off the point that the court previously made... Did he roll the window down? Not once he told him to get out of the vehicle. Did he hand it through the crack? The court is skipping a sequence of events, Your Honor, because he was asked to produce his driver's license, which was an understandable request, and the officer specifically told him once he showed him his driver's license, he would be on his way. Yeah, but they wanted him to, and they asked him to step out, right? No. As he got his driver's license, he had to get up to the front seat to get his driver's  He had his driver's license in his hand, and as he was producing his driver's license, they didn't look at it, they didn't even know he had it. They said, get out of the car. And his reaction at that point was confusion as to why they were asking him to get out of the car. Okay, all right. But what he decides to do is to start the ignition. Not in that order, Your Honor, because you're skipping ahead. Because what actually happened is, he asked questions. He never refused to get out of the vehicle. He asked questions because... Instead of obeying the officer's commands, he starts questioning the officer. It's not that simple. Because what, in fact, happened is, after he started asking questions, like why is this... Essentially asking, why is this going from, you want to see my driver's license, to demanding to me get out of the car? And the officers made a conscious decision not to give him any explanation. And that is a very critical point. That's probably the symbol. That justifies him driving away, which resulted in the chase, the pit maneuvering, the shooting? Well, what happened after that is, the officer basically got hostile and said the words, get out or go to jail. Those were the words. Yeah, he's not... Well, because they think that he has committed loitering. No, they don't. Well, he does say... And I say that because... No, the officer does say, you are obstructing justice now, and then get out. He does accuse him of loitering, but he does not understand what loitering is. He conducts no investigation according to the statute that constitutes loitering. And if he had done that, he clearly was not committing a loitering offense. Mr. Howard, here's what I see happens. They ask for the ID, they tell him he's suspected of loitering, and then they tell him to get out of the car. He asks the question about loitering. He doesn't do that. He's really arguing with them. Yes, he's asking, how am I loitering? Instead of obeying their commands. And then he decides to start the ignition of the truck. He drives toward the highway. He goes through two stop signs. He doesn't stop. He drives on the wrong side of the road. The officers then do a pit. This is a vacant access road to a shopping center. Are there stop signs? There are stop signs, but there is absolutely no vehicles in sight. He is simply leaving. And if they aren't chasing him... Let me ask you this. Yes. If there are no cars around, am I obliged to come to a complete stop at a stop sign? Yes, that is correct. And if I don't, can I be stopped? You are not, in this scenario, as a deputy, authorized to chase this man. He has committed no crime. He is suspected of no crime. The crimes that they fabricated I can go through in some detail, but they are giving chase to this man who is scared out of his wits for no reason. And I say for no reason because these officers are very explicitly trained on de-escalation. If someone asks you to get out of the car and they hedge on it because they are scared, confused, you simply explain for officer safety. You give them a reason. And they know this. And they do this, except this department allows them to ignore that training if they choose to ignore it. This department allows them to scare a man to death so that he will flee. Yes, sir. You have complained that the officer violated the Constitution. I also... That's different from saying that they didn't follow training. I keep coming back to that. May I quote from the case law, Your Honor? A policy violation by an officer may eliminate qualified immunity if the policy itself is designed to protect the constitutional rights of a citizen and provide the officer with fair warning of established law. I don't think we disagree on that principle. And what I'm saying is that these policies that were in effect, the vehicle pursuit policy, the pit maneuver policy, the chase policy, these were put into effect to protect the constitutional rights of a citizen. A person may simply move away from a police officer if he's not committing a crime, he's not suspected of a crime, and he hasn't even been detained. That's a very different thing from saying, what you just read to me, it's a very different saying that any violation of a policy makes it into a constitutional tort. Which is not what I'm saying. And I understand the court's position on that, and I actually agree with it. But what I am saying is the policy violation may be integral to a constitutional violation if they are aimed at the same principle, which is to protect the constitutional rights of citizens. And that is explicitly what these policies are designed to do. They are designed to protect citizens from abuse by police. I'm sorry, Counselor, with the limited time you have, I would ask that you please take us, fast forward us to the actual shooting, where he's surrounded by three cops. Some would say it's arguable, was it his car moving? Was it the officer's car that bumped up against him and caused the movement? But at that moment, what is your argument as to why shooting this gentleman in the face in that context was excessive? You at least have a factual dispute. I submit there's really no dispute if you look at the evidence, but you at least have a factual dispute as to what's going on there. Let's take the evidence and the light most favorable to your client and explain to me why it was clearly established that it violated the Constitution. It was a clearly established use of excessive force. In the light construed most favorably to my client, and I think appropriately by the experts as well, the vehicle that Mr. Bolton was driving had come to a complete stop, it had spun around, the engine was still running. Were the tires still squealing? I was about to mention that. The engine was still running and tires were spinning, but the car was not moving. Mr. Bolton was not turning the wheel in any direction. Because the tires were spinning, it could break free, couldn't it? From where he was, absolutely not. He was pinned on three sides. Could a reasonable officer perceive that it might? A reasonable officer would take more than three seconds to get out of his vehicle and shoot Mr. Bolton in the head, while another officer is telling him to turn off his engine. He couldn't even hear the instruction, please turn off your engine, before the bullet went through his eye. No, a reasonable officer seeing that the car was pinned in on three sides, seeing that there was a distance between his vehicle and Mr. Bolton's vehicle, and the vehicle was not moving, seeing that there was an opportunity to at least, feasible, the word in the case law is feasible, seeing that it was feasible to give Mr. Bolton a warning, would have at least given him a warning before shooting him in the head. That's not what happened. He jumped out and immediately, you can see it on the camera, immediately shot him in the head, even while the other officer is asking him to turn off his engine. And that is a constitutional violation. Okay, Mr. Howard, you've saved a few minutes for rebuttal. Let's hear from Mr. Court. Thank you, Your Honor. Good morning, Your Honors. Aaron Court. I have the privilege today of representing Sheriff Len Wood and Deputies John Collins, Christian Spinks, and John House of Coweta County Sheriff's Office. It was fast, wasn't it? I mean, if we start where your friend on the other side just left off, the car's been immobilized because of the pit. And they get out, the officers get out, and I mean, that shot, it's like that, isn't it? Yes, it is a quick sequence of events, Your Honor. I think I would disagree that the video shows the car was immobilized. I don't think that's an appropriate word. At first, I'd note it's conceded that—  I mean, I know the engine's running, the tires are squealing, they're spinning, but is it  I mean, when I say immobilized, I mean, it's not moving. Well, Your Honor, I think, first, you can see that the car is certainly shifting and moving, suggesting, as Your Honor stated, that the vehicle had the possibility and the gas pedal is conceded to be depressed 71 to 100 percent of the way down. And if that car did break free, officers are not going to have more than one or two seconds before they're under that car. But is that not a question of fact? I mean, number one, was it really moving? You know, what was reasonable for the officers given the context? My concern is that this is resolved at a summary judgment stage when there do seem to be questions about what is happening at that moment. So, Your Honor, I think I would disagree that there are disputes about what the facts are because we do have body camera footage. And so I think under Scott v. Harris, we have to take what the body camera footage shows as correct. I think what we're disagreeing about— Well, what the body footage shows is that the officer's car bumped Mr. Bolton. He's surrounded by three other cars. The wheels are squealing. I think a question is were they squealing because he was actually trying to move in front of a car, you know, with a car already in front of him? Or were they squealing as a reaction of the pit maneuver? So the video shows that, but the video doesn't answer those questions, the cause questions. So I think the video answers—I think the video and the vehicle information answers that the gas pedal was being depressed. It wasn't drive. It was going forward. And plaintiff concedes after the pit of the Tahoe moved forward. That's in page 8 of the district court's order, paragraph 82 of plaintiff's response to the statement of material facts. So they concede. It rolls forward. It bumps Deputy Collins' car. And then we have the gas pedal being depressed 100 percent of the way down. I think— Does it matter why? I mean, is what matters here is the officer's perception when he gets out? After all of these events, we have to look at the totality of the circumstances from the officer's perspective, a reasonable officer's perspective. That's right, Your Honor. To look at what's happening with the wheels spinning and the engine still running. That's right, Your Honor. And that's what I was going to get to here is under the Fourth Amendment, we have to sort of frame this from the perspective of the officer who used the force. So whatever might have been in the mind of the plaintiff or an officer who didn't use the force, that's not relevant to the Fourth Amendment standard. And there's also allowances. The Supreme Court and this court has repeatedly held that we don't judge this decision-making with 20-20 hindsight. We have fast-developing circumstances. And this court has held in other cases that an officer is not required to engage in the trajectory and the analysis of the trajectory. I'd posit that the officer is also not required to engage in advanced physics to make a determination as to specifically whether this vehicle can definitely get through them. A reasonable officer could believe that a Tahoe the size of this vehicle had the possibility and the propensity of being used as a deadly weapon and was actively being attempted to be used as a deadly weapon to injure these officers who were standing in front of the vehicle. That part, I think, why can we just assume that from the video? I mean, you also have, again, someone who's surrounded by three cop cars. Clearly, the cop car was strong enough to be successful in the pit maneuver if you want to talk about comparing strength. Again, I'm trying to understand the leap from what you just described visually to the analysis that you just talked about, which even you describing the steps takes us more than four seconds. Right. And I think one other point I think that we're actually arguing about is not the facts of what was happening, whether the tires were squealing, whether the gas pedal was being depressed, and whether the car was trying to move forward. Those facts aren't disputed. What we're disputing is the reasonableness of whether the officer took in that information and made the decision under the Fourth Amendment. And the reasonableness, although it's this fact-bound morass, and it's a difficult question to answer in some cases, it's not something that goes to a jury. It's something for a court to decide. It's also not something for experts to decide. It's something for the courts and for your honors to decide. So I think what we're disagreeing about is not what the facts were. I think that's all agreed on. I think it's what a reasonable officer could have done having taken in those facts. Well, I'd know, because if you had summary judgment and you have an opposition, it's because there is an agreement on what the facts necessarily mean. On what the video actually shows and what was reasonable given the circumstances. So I think if you just take what the facts are agreed on, which is that the vehicle was attempting to move forward, that the tires were squealing, and that this suspect had previously refused to obey lawful orders to step out of his vehicle, had been noncompliant, had driven off from a lawful traffic stop, and committed an aggravated assault against Deputy House in the process of doing so, whether the vehicle hit him or not under Georgia law, it's not a requirement. Under those circumstances, I think that there's no question that this was reasonable for the officer. Considering that he's making a split-second judgment in a circumstance that is tense, uncertain, and rapidly evolving, given all of the case law that surrounds use of a vehicle as a deadly weapon, we think at the very least any finding that there was a constitutional violation would certainly be a departure from this court's precedent. So at a minimum, we have to also address the qualified immunity perspective. To get to the point that I think Judge Abudu was getting at, you're saying, as I understand it, that we look at that video and we give every inference from the undisputed video to the plaintiff, but even doing that, there's no clearly established violation of the Fourth Amendment. Correct, Your Honor. And that's why you're saying it's a judicial decision. That's why we get to decide the immunity question. Yes, Your Honor. And to the point of immobilization, this court held very recently in Settle v. Collier, there's no categorical rule that a vehicle has to be in motion in order to be considered a deadly weapon or an officer to be in reasonable fear that a suspect is trying to use it as a deadly weapon. Well, then why doesn't that turn in the, I guess, inverse, reverse, that there's a categorical rule that every time you are in a vehicle, it is being used as a deadly weapon? I mean, it sounds like that's what you're saying our case law either stands for or is the direction it's headed. So I think if an officer has facts, knows facts, and those facts are undisputed, that not just the suspect is in a vehicle, but actively attempting to use it against the officers, drive it in the officer's direction, I think under those circumstances a reasonable officer believes that. This would be a very different case if as the car spun out. Whether objectively a reasonable officer could perceive that. That's correct, Your Honor. It is an objective test from the perspective of the officer, but it is objective. That's right. And so this would be a very different case if after the pit maneuver the vehicle didn't move at all and that there was no depression of the gas pedal and the officers had no reason to believe that the vehicle was trying to move past them. It would be a very different case, but that's not this case. And the facts are not disputed that the vehicle was attempting to move. Now, let's talk about that. So if the car engine had stopped and the wheels weren't spinning, this would be excessive force, wouldn't it? I think it would be a much more difficult case. For you to defend. Correct, yes. And I would not be thrilled to be having to make those arguments, but as it stands, I think the substantial amount of case law from the circuit indicates that a reasonable officer in the position of Deputy Collins in this situation would believe. I mean, that's what it really turns on. This case really comes down to, at the end, the fact that the engine was still running and the wheels were still squealing. That's right, Your Honor. From Officer Collins, what about the arrest? Now you've got someone from what you're saying. The video shows this gentleman has been shot in the eye. We see the blood. I mean, the video is very clear and graphic on that front, too. So my understanding is there's also a claim of excessive force during the arrest. So you have someone who's been shot in the eye, pulled out of the car, turned around, back behind. Like, why is that not excessive? You seem to have somebody who's been rendered immobile. So I think the video evidence shows that Mr. Bolton had not been rendered immobile, at least from an officer's perspective. You can see he puts his hand on the wheel at one point, at which point the officers reach in and remove the keys to control the situation. And then you have him reaching into the back seat of a vehicle that is full of objects that the officers are not aware. And you can hear what they're saying. The reason they want to take him out is to control the situation. And you have a handcuffing that takes, you know, even taking plaintiff's version of the video, which it's not all totally visible, but it's 20 seconds. It's a 20-second handcuffing, and the officers ask him, do you want to sit on your side? You forgot about the knee, right? Isn't there a knee? There is a knee, Your Honor. And he's being told to relax with a bullet in his eye. That's right, Your Honor. And he does begin, as the officers begin handcuffing him, begin pulling away his arms. And so they do tell him to relax, and they do place a knee on his lower back. There's many, many cases from this court, as cited in the briefs, that hold this kind of force to effect an arrest to control a situation, a dangerous and unknown situation to the officers at that time. That's de minimis force. So are you saying that I will find cases that say a person who's been shot in the eye can be handled in that way and it can be considered de minimis force? I don't know about the shot in the eye fact, Your Honor. But from my perspective and from the officer's perspective, the fact that he was shot in the eye does not change the fact that he's reaching, he's moving, and he's pulling away from the officers. And so to the extent that those facts are present to the officers, I don't think that changes our analysis. Well, some could say those are adjectives that don't apply. It could be writhing, could be confused, could be a lot of things. And that's, again, the reason why I'm just wondering why that also is not for a jury to determine, as a matter of fact. And so I think this goes to a similar point, which is we're not disagreeing about the facts. We're just disagreeing about whether the officer's response to those facts was reasonable under the Fourth Amendment. And so to that extent, I think that's not a jury question. It's not a question of fact. It's a question of law. Right. No, I understand with the Chief's framing what you're arguing in terms of the legal issue as opposed to what would be proper before a jury. I'm just questioning whether or not the video in terms of the fact findings are as clear cut as you suggest. And I think the facts that we rely on, I would say, are the ones that are clear, Your Honor, and certainly from the officer's perspective. I do want to address the claim against Deputy House. As an initial matter, to the extent this court finds no constitutional violations, then a failure to intervene claim cannot succeed. I'd also note that at page 47 of Appellant's initial brief, he concedes nobody could have intervened to prevent Deputy Collins from firing that shot. We strongly agree with that. And so to the extent he's arguing that Deputy House should be liable for failing to intervene in that act, we think that claim fails. And I think the only things that Deputy House are argued to have not intervened in at this court are the events leading up to the use of force, none of which are alleged to be constitutional violations. So I think necessarily all the intervened claims against Deputy House have to fail. Next thing I want to address is the state law claims. Under the Georgia Constitution, officers are entitled to official immunity when they're acting within their discretionary authority or they're engaging in a discretionary act, rather. And it's not disputed that this was all discretionary acts by the officers. And so the plaintiff has to show that the officers acted with actual malice in intent to cause injury. And this is unlike the Fourth Amendment. The official immunity under state law is a subjective test. And so it's not just whether the officers took the action with the intent of doing the action. It's sort of the state of mind they had, and they need to have intended to cause harm or wrongful state of mind. And this court has held that that test, because it is subjective, is actually more difficult to reach than the objective test under the Fourth Amendment. So again, we'd assert to the extent that there was not a Fourth Amendment violation, then these officers are clearly entitled to official immunity under state law. And then lastly, to the claim against Sheriff Wood in his official capacity. It's black-letter law before this court that official capacity claims against sheriffs for their purposes of developing use-of-force policy are, in fact, claims against the state itself. And so those claims, this court I'm sure is well aware, fail for dual reasons of the state of Georgia's Eleventh Amendment immunity and then under the text of 1983, the state of Georgia is not a person within the meaning of that statute. So unless the court has any other questions that I can address, I'll yield the little bit of my time that I have. Thank you. Thank you. Mr. Albert, you have three minutes. I'll jump around just a little. I want to comment. Yes, it does appear to me that the tires were squealing because Mr. Bolton's vehicle was spun by the pit maneuver and his foot was probably still in the accelerator after he finished spinning. And in the three seconds after he came to a stop, he didn't have time to realize even what was going on. I guess to the other side's point, why does that matter? I mean, the officers, all they see are squealing tires, someone they just had to chase to get and exercise the pit maneuver. Why does what actually he was doing matter in this situation? Well, you'll see throughout this case, as you will see in many other cases, a very clear attempt to establish that the vehicle is a weapon because based on the case law, if the vehicle is a weapon, Mr. Bolton can be shot. And so that's a characterization that allows the deputy in this case to shoot Mr. Bolton. The reality, however, is that the vehicle did come to a stop. The tires may be squealing, but it is not moving. It's not going anywhere. It's surrounded on three sides by patrol vehicles, and it's a few feet from the first vehicle and isn't even spanning that distance. So in that three seconds, there's ample time to tell Mr. Bolton to turn off your engine, take your foot off the accelerator or something, which is what one deputy does while the other deputy shoots him in the head. I submit, and I'm changing the subject slightly, that it is a serious legal and factual error to disregard the deliberate actions of the deputies. That created this scenario, and that's kind of where we are. We're jumping to what happened during the actual shooting itself, and let's not pay too much attention to how we got there. But how we got there is really what is happening in this case and throughout this country, frankly, where a citizen is put in a situation where he is unnecessarily fearful, unnecessarily doesn't know what to do. No course of action is appropriate. Well, I agree with you. We have to consider the totality of the circumstances, right? And the events that lead up to that shooting are all in the mix, right? Yes. Including running stop signs, driving on the wrong side of the road, starting the engine when he's been ordered to get out of the car and produce his ID. All of those things. And anything you say the officers did that's unreasonable. And all I'm suggesting is if you look at the totality and how cooperative Mr. Bolton was with the previous deputy.  And how it changes from we'll be gone, we just need to see your driver's license to we don't want to see your driver's license. One thing I don't see here is any evidence of cooperation. What you see, Your Honor, which if I may, and I know I'm over, but I'll just do it in a sentence or two. To answer my question, yes. What you see, Your Honor, is a young man who's asleep in the parking lot in the middle of the night, who thinks he has permission to be there, who's being checked out again by officers, which is perfectly fine with him. Where's the evidence of cooperation? That's what I'm getting to, Your Honor. He is completely cooperating. He gets up in the front seat, gets his driver's license, has his driver's license in his hand, and suddenly everything changes. We don't want to see your driver's license. We want you to get out of the car in this isolated location in the middle of the night. Are you telling me if I go back and watch that, are you telling me that if I go back, I watch these videos, that the officer says, we don't want to see your driver's license? No. What I'm telling you is he asked them to see his driver's license, and when he had it in his hand, he never – You said just a moment ago, we don't want to change, we don't want to see your license. I don't remember that being said. Once he had the license in his hand, they not only never looked at it, they never asked to see it. From that point forward, they are telling him to get out of the car, and he doesn't know why. Mr. Howard, I think I understand your response to my question. Thank you. Okay. I thank you for your time, Your Honor. Thank you. We're going to move to our last case. Okay. Thank you.